UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-60812-CIV-COHN/SELTZER

STAR-BRITE DISTRIBUTING, INC.,

    Plaintiff,
vs.

KOP-COAT, INC.,

    Defendant.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

**THIS CAUSE** is before the Court upon Plaintiff's Amended Motion for a Preliminary Injunction [DE 11]. The Court has carefully considered the motion, Defendant's Response [DE 16], Plaintiff's Reply thereto [DE 19], the credibility of witnesses testifying at a two-day hearing held on July 23, 2009 and August 10, 2009, and the written final arguments of counsel [DE's 46 and 48].[1]

I.  BACKGROUND

The parties are competitors in the marine fuel improvement market, selling ethanol gasoline additives to boat owners and marinas for use to improve marine fuel performance in boats. Plaintiff Star-Brite Distributing's product is called StarTron, while Defendant Kop-Coat's Valvtect product is called VEGA, which stands for Valvtect Ethanol Gasoline Treatment.[2] On June 30, 2009, Plaintiff Star-Brite Distributing, Inc.

---

[1] The Court notes that the Defendant's Motion to Dismiss, filed July 27, 2009, concerns issues of the types of damages sought in Plaintiff's Amended Complaint, and need not be resolved before consideration of the Amended Motion for Preliminary Injunction.

[2] Valvtect is a subsidiary of Kop-Coat, Inc.

("Plaintiff") filed an Amended Complaint against Kop-Coat, Inc. [DE 10] (hereinafter, "Defendant" or "Valvtect" or "Kop-Coat"), as well as an Amended Motion for Preliminary Injunction. Star-Brite asserts claims for false advertising under the federal Lanham Act (Count I), for violation of Florida's Deceptive and Unfair Trade Practices Act (Count II), for violation of Florida's false advertising statute, Fla. Stat. § 817.41 (Count III), and a claim for common law unfair competition. Plaintiff seeks a preliminary injunction to stop Kop-Coat from running print advertisements stating that certain lab tests show VEGA outperforms StarTron.

## II.  FINDINGS OF FACT[3]

1. The relatively recent federal mandate to switch maritime fuel to 10% ethanol ("E10") expanded the demand and market for fuel improvement products because E10 fuel does not burn as efficiently as regular gasoline.

2. In 2006, Star-Brite's StarTron product was one of the first E10 additives to market, gaining a dominant market share. StarTron's active ingredients are enzymes.

3. Valvtect, a company that has been in the business of petroleum fuel additives since 1987, believed StarTron was inferior and in March of 2007 set out to test Star-Brite's advertising claims on four performance measures: fuel stability,

---

[3] The Court has received proposed findings of fact from each party. These documents have been filed in the docket of this case and served on all opposing parties [DE's 45 and 47]. Due to the technical nature of the evidence in support of the preliminary injunction motion, the Court does incorporate verbatim a small portion of Plaintiff's Proposed Findings, though this Court has made an independent judgment that these findings are correct. Cf. Bright v. Westmoreland County, 380 F.3d 729 (3rd Cir. 2004).

corrosion resistance, water control and prevention of carbon deposit build-up.

4. Valvtect used these test results in developing their own product, VEGA, and used the results of the comparison tests to advertise VEGA in various comparison ads.  See Comparison Ad [DE 11-3]; Plaintiff Exhibit 6 (revised ad).[4]

5. VEGA is a proprietary formulation of chemical additives generally used in the refinery and fuel industry.  VEGA came to market in December of 2008. Defendant ran the comparison ads at issue in this action starting in 2009.

### A.  Fuel Stability

6. Fuel stability measures the shelf life of diesel fuel or gasoline before it starts to turn into a gummy sludge-like material.  ValvTect used the ASTM[5] D525 test to compare the fuel stability of VEGA with StarTron.

7. The ASTM D525 test is a generally accepted test for gasoline whose standard protocol indicates it must be run at temperatures of 212ºF, far in excess of conditions that virtually any boater's fuel tank would ever experience.  It is commonly used to test gasoline for oxidation stability.

8. Temperatures in a boat's engine, as opposed to its fuel tank, can expose fuel to temperatures in excess of 110°F.

9. The ASTM D525 test was not designed to test E10 based fuels, which is the focus of the comparison ads at issue.

---

[4] The Court hereinafter when referring to the ads as a whole will refer to them as "Comparison Ads."  This term includes what the parties have called the "Rebate Ad."

[5] "ASTM" is an acronym for the American Society for Testing and Materials.

10. Enzymes, such as those used in StarTron, generally are effective within a 20° range, and are more sensitive to high temperatures than the chemical additives traditionally used in fuel additives.

11. StarTron's enzyme technology may not perform to its maximum capabilities at 212°F, but nevertheless may work well as a stability additive for E10 fuel under normal operating marine conditions.

12. The language cited in the ASTM D525 test protocol indicates that ASTM D525 is not an applicable test upon which to base a comparison advertisement for E10 fuel. The "Scope" of ASTM D525 establishes that this test is appropriate only for finished gasoline, and not for gasoline including oxygenates such as E10. In fact, Note 2 of ASTM D525 contained within the "Scope" warns the user that "the precision data were developed with gasoline's derived from hydrocarbon sources only without oxygenates." E10 is an oxygenate. In other words, ASTM D525 was not meant to test E10 fuel, the precise fuel that VEGA and StarTron are designed to treat.

13. Stability results from ASTM tests can vary upon the quality of the fuel tested, which in turn can be influenced by the source of the fuel and the length of time it has spent in storage.

14. In following the testing protocol, Kop-Coat never ran the ASTM D525 tests on E10 fuel, despite the fact that StarTron and VEGA are E10 ethanol fuel additives.

15. In its Comparison Ad, Defendant asserts that Valvtect improved stability by

       138% while StarTron only improved stability by 4%.

16. On cross-examination, Defendant's fuels expert, Frederick Ruhland, Vice President of Technology and Northeast Sales Director for Valvtect, revealed that more recent tests performed by Defendant's independent lab showed stability improvements by StarTron on E10 fuel of nearly 60%. Plaintiff's Exhibit 3.

17. After the commencement of litigation, Plaintiff used the same independent lab used by Defendant, Saybolt LP, and ran the ASTM 525 protocol with E10 fuel and found that StarTron also had significantly greater improvement than the 4% used by Defendant in its comparison ads.

18. The claims made by Defendant in its comparative advertising that industry tests showed only a 4% improvement for StarTron is misleading because the ASTM 525 test used was not designed for marine E10 fuel users, which is the particular market the advertisement was intended to influence, despite the fact that the ASTM 525 may be the industry standard for regular gasoline engines.

19. This finding is supported by the subsequent laboratory tests showing that StarTron does have a significantly greater fuel stability improvement than 4% when tested on E10 fuel.

## B. Corrosion Control

20. Defendant used the NACE[6] TM-0172 test to compare the corrosion control properties of VEGA and StarTron.

---

[6] "NACE" stands for National Association of Corrosion Engineers.

21. These tests were not performed by an "independent" laboratory, but by Ken Chem Company, Valvtect's corrosion inhibitor supplier, as blinded and coded samples.

22. The results of this test, as touted in the Comparison Ads at issue in this action, stated that Valvtect showed no rust while StarTron showed 25% rust. This ad was later amended to state that the test results showed Valvtect with no corrosion and StarTron with 25% corrosion. Plaintiff's Exhibit 6.

23. The NACE TM0172 test was designed to determine corrosive properties of fuel in petroleum product pipelines. E10 fuel does not flow through pipelines, but is distributed through railroad cars or tanker trucks.

24. The NACE TM0172 test specifically states that it "does not predict corrosiveness in standing aqueous phase," which describes the condition that marine fuel is in while it sits in a tanker trunk, railcar, marina fuel tank, or a boat's fuel tank. Section 1.3 of NACE TM0172, Exhibit E to Affidavit of Frederick Ruhland [DE 16-3 at p. 48 of 176].

25. Plaintiff further put forth credible evidence that marine fuel tanks are made from aluminum or polyethylene, which by definition cannot "rust," as they do not contain iron.

26. Other components of the fuel system, such as the fuel injection system and parts of marine engines may be made of steel and contain iron and thus could be susceptible to rust or corrosion, though federal regulations state that marine fuel lines must not contain steel.

27. While the NACE test results paid for by Valvtect's supplier, Ken Chem, may have been accurately reported and performed to the NACE standard, this particular test does not stand for the proposition in the ad that Valvtect had 0% rust and StarTron had 25% rust in an E10 marine fuel system.

28. The Comparison Ads are misleading, though they are not literally false.

### C.  Water Control

29. Turning next to the test Defendant uses in the ad for testing water control, ASTM D1094 is a "Standard Test Method for Reaction of Aviation Fuels." Aviation fuel does not contain E10, and VEGA and StarTron are not designed for use in aviation engines.

30. Controlling the water content in a fuel tank is important to prevent phase separation, a condition in which the water alcohol that is normally contained in fuel (and in a greater percentage in E10 fuel) falls to the bottom of the fuel tank causing the remaining fuel to not perform to specifications. This condition can lead to engine damage or a stall while a vessel is away from the shore.

31. VEGA and StarTron rely on different theories to prevent phase separation, with competing expert testimony on which method is better. The Court need not determine whose theory is correct in resolving the present motion.

32. VEGA is designed to retain water in the fuel in order for it to be burned off in the engine before it can dissolve in the fuel tank, while StarTron works to keep the water from becoming a greater percentage of the fuel.

33. Plaintiff's expert, Edward English, testified that in a 100 gallon marine fuel tank,

the water content would have to be as a high as 5000 ppm for phase separation to occur [DE 36 at p. 61], while Defendant's expert, Fred Ruhland, testified that phase separation could occur between 1000 ppm and 7000 ppm.

34. The Comparison Ads state that pursuant to ASTM D1094 and ASTM E1064[7] Valvtect improved water retention while StarTron was "50% Less Effective than Valvtect." Plaintiff's Exhibit 6.

35. According to the testimony, the test results upon which this comparison was made found that untreated gasoline retained 262 ppm, the Startron treated gasoline retained 272 ppm (a 3.8% improvement), and the Valvtect treated gasoline retained 284 ppm (a 8.4% improvement).

36. Valvtect supports its claim that StarTron is "50% less effective" by comparing its 8.4% improvement to StarTron's 3.8% improvement.

37. However, Defendant's expert, Frederick Ruhland conceded that the small differences from 262 to 272 and 272 to 284 are statistically insignificant.

38. In addition, because phase separation does not occur until the water content is at least 1000 ppm (Ruhland's testimony) or even 5000 ppm (English's testimony), to claim that the test results show that StarTron is 50% less effective in preventing phase separation is clearly misleading, though not literally false.

### D. Carbon Deposit Control

39. The final area of comparison depicted in the advertisements at issue concern

---

[7] The original comparison ad which ran referred to ASTM D1094 and ASTM D1064. Valvtect acknowledged that ASTM D1064 was not applicable and changed the ad to read ASTM E1064. Plaintiff's Exhibit 6.

carbon deposit control. All gasoline products have the tendency to leave carbon deposits in engines, potentially causing problems.

40. Gasoline is typically treated by all refiners with certain chemicals to control carbon deposits, though refiners add the minimum amount required by the Environmental Protection Agency ("EPA").

41. The EPA maintains a list of approved Deposit Control Gasoline Additives ("DCA") and test methods.

42. The VEGA product utilizes more of the approved DCA's than is required.

43. It is unknown whether the StarTron product utilizes any of the listed DCA.

44. The automobile manufacturing companies are involved with the petroleum industry to help establish the tests for EPA approval.

45. Valvtect's initial ad stated that it prevents fuel injector and value deposits by using the test method of "EPA Vehicle Deposit Test" and listed under Valvtect the brand names of "BMW, Chrysler, Ford & GM." Under StarTron the ad stated "No Verification."

46. The revised Valvtect ad changes the language under test method to "ASTM D5500, ASTM D5598, and EPA Detergent Rule Tests," and eliminates the references to brand name vehicles to state that Valvtect "keeps injectors & carburetors clean." Plaintiff's Exhibit 6.

47. Plaintiff argues that the initial ad falsely implied that vehicle manufacturers were endorsing the VEGA product over StarTron.

48. The Court finds that the present ad is not misleading or false regarding carbon

        deposit control, though the initial ad was misleading in implying that the listed car manufacturers endorsed the VEGA product over StarTron.

### E.  Consumer Deception and Materiality

49. Peter Dornau, CEO and President of Star-Brite, testified that since the Comparison Ads were run he has dealt with questions from customers on a daily basis to refute Valvtect's statements in the ads.  Testimony of Peter Dornau at pp. 66-68 [DE 37 -- afternoon session].

50. Gregor Dornau, Vice President and Manager of Sales and Marketing for Star-Brite, testified on direct by way of affidavit that numerous retailers asked questions of him regarding the truth of the Comparison Ads and told him the ads would affect sales and promotions.  Transcript at pp. 16-18 [DE 36 -- morning session] (referring to Affidavit of Gregor Dornau, dated July 21, 2009).

51. The customer questions, which range from large national merchandise managers from retailers such as West Marine, to regional retailers in different parts of the country, all the way to individual boat owners, are directed to whether the claims in the Valvtect ad are true.  Id. at 17; Peter Dornau at 67.

52. Defendant's President, Gerald Nessenson, conceded that he designed the Comparison Ads to influence boaters to stop buying StarTron and switch to VEGA and that the ad is likely to do so.  Testimony of Gerald Nessenson at 173 [DE 42].

53. Consumers are deceived enough by the advertisement claims to question whether to purchase StarTron or VEGA.

10

54. The Court finds that the claims in the advertisements are material to consumers' purchasing decisions and that consumers are likely to be deceived.

### III.  CONCLUSIONS OF LAW

#### A.  Preliminary Injunction Standard

In order to obtain a preliminary injunction, Star-Brite must establish the following four elements: (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to plaintiff outweighs the threatened harm the injunction may do to the defendants; and (4) granting the preliminary injunction will not disserve the public interest.  Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994).  Because a "preliminary injunction is an extraordinary and drastic remedy," it is "not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." Id. (quoting Northeastern Fl. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)); see also McDonald's Corp. v. Roberts, 147 F.3d 1301, 1306 (11th Cir. 1998).

#### B.  Substantial Likelihood of Success

To establish a likelihood of success on the merits of a false advertising claim under the Lanham Act:

> the movant must demonstrate the following: "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects

11

>  interstate commerce, and (5) the movant has been-or is likely to be-injured as a result of the false advertising." Johnson & Johnson, 299 F.3d at 1247.

North American Medical Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1224 (11th Cir. 2008).

Plaintiff must meet an additional burden in this case because Defendant relied upon scientific testing. When an advertisement cites testing such as in this case:

> the advertisement is labeled as an "establishment" claim. BASF Corp., v. Old World Trading Co., 41 F.3d 1081, 1090 (7th Cir. 1994). To prove an establishment claim literally false, the movant must "prove that these tests did not establish the proposition for which they were cited." Quaker State Corp., 977 F.2d at 63. We find this method of evaluating such advertisements to be analytically sound, and adopt the reasoning for use in the Eleventh Circuit.

Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1248 (11th Cir. 2002). Plaintiff has met its burden to show that the tests relied upon by Defendant did not establish the propositions for which they were cited in comparing these marine fuel additives. The fuel stability test is not applicable to an enzyme-based E10 fuel additive for the marine environment. The fact that Defendant relied upon tests approved for use in the petroleum industry does not insulate Defendant from its misleading attempt to cite to such tests to compare a product sufficiently different in its chemical makeup to take it outside the universe for which the standard test was designed. Although Defendant argues that because Plaintiff's enzyme product is outside the mainstream of the petroleum industry and therefore it should be Plaintiff who has to conform to standard testing, in this case it is Defendant who has created a misleading comparison ad by relying on tests that do not establish that StarTron only

shows a 4% fuel stability improvement. Moreover, when these standardized tests, such as ASTM D525 are modified for the E10 fuel, Defendant's claims are proven wrong.

Similarly, the corrosion and water control tests do not stand for the proposition that StarTron is less effective in the marine fuel additive market. Again, while these tests have their role in the petroleum industry, applying them in the context of the Comparison Ads to Star-Brite's enzyme based product is misleading.

The Court concludes that the claims in the ads in this case were not literally false, though they were misleading. The distinction between a "false" and "misleading" claim is important, because "once a court deems an advertisement to be literally false, the movant need not present evidence of consumer deception." North American Medical, 522 F.3d at 1224, n.11, quoting Johnson & Johnson, 299 F.3d at 1247. Although the Court finds the ads misleading and not false, as noted above, Plaintiff was able to put forth evidence through the testimony of Peter Dornau that its customers, both individual and large retailers have called him personally to ask about the ads and test results, reporting to him that they were questioning whether to continue purchasing StarTron or switch to Valvtect.[8] Such evidence not only shows deception, but also the materiality of the ads, countering Defendant's argument that Plaintiff must still establish

---

[8] This testimony by Peter Dornau was received without objection by Defendant, despite the fact that arguably statements made by retailers regarding statements made to them by customers, presents a double hearsay issue. Air Turbine Technology, Inc. v. Atlas Copco AB, 295 F.Supp.2d 1334, 1344 (S.D.Fla. 2003)(J. Marra), *aff'd*, 410 F.3d 701, 708 (Fed. Cir. 2005). The Court presumes that no objection was made because in this case, the statements by retailers to Peter Dornau regarding their own bulk purchases of StarTron are likely present sense impressions of their confusion caused by the advertising.

materiality. Johnson & Johnson, 299 F.3d at 1250.

Plaintiff has also shown that it has been and is likely to be injured as a result of the false advertising. The testimony of both Plaintiff's executives and that of Valvtect's President, Gerald Nessenson, shows that the intent of the Comparison Ads was to cause consumers to switch products. Finally, there is not question that the misrepresented product or service affects interstate commerce as the compared products are sold nationwide.

### C.  Irreparable Harm

Defendant argues that Plaintiff has a legal remedy for damages even if a violation of the Lanham Act is proven, as Plaintiff cannot show irreparable harm. However, irreparable harm is presumed when a false advertisement that is literally false compares the two products, such as in this case. North American Medical, 522 F.3d at 1227. It is clear that the Comparison Ads are likely to cause direct changes in consumer's purchasing habits from Plaintiff's product to Defendant's product.

### D.  Balance of the Harm to the Parties and Public Interest

In this case the continuing and potential damage to Plaintiff of consumer product switches because of the Comparison Ads far outweighs the delay of advertising Defendant's product during the pendency of this action. The Court has allowed the Defendant's ads that have already been placed prior to the completion of the injunction hearing to remain in circulation. Therefore, stopping any further Comparison Ads puts a minimal burden upon Defendants.

As to the public interest, the Court has a duty to enforce the law to stop misleading advertising within the marketplace. Although vigorous competition is a public interest by itself, the public is better served when misleading information is curtailed.

## IV. CONCLUSION

Based upon the foregoing factual findings and legal analysis, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Amended Motion for a Preliminary Injunction [DE 11] is hereby **GRANTED**;

2. Defendant, together with its respective officers, agents, servants, employees, attorneys, subsidiaries, and all persons acting in concert with them or under their inducement, encouragement or persuasion, are enjoined and restrained from performing any of the following acts, directly or indirectly, on their own behalf or on behalf of any third party: advertising or marketing of any comparison ads based upon any testing regarding fuel stability, corrosion control or water control as depicted in the Comparison Ads, or as to any endorsement of its product's carbon deposit control benefits by any automobile manufacturer, unless that manufacturer has specifically consented to the endorsement.

3. This preliminary injunction is effective immediately, though Plaintiff shall post a bond in the amount of $10,000 by September 8, 2009;

4. Defendant is further directed to immediately take the necessary action to prevent

further publishing of any of the Comparison Ads in any form of media.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 31st day of August, 2009.

                                      JAMES I. COHN
                                      United States District Judge

Copies furnished to:

Leonard Samuel, Esq./Gregory Haile, Esq.

Robert Ferencik, Jr.